IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MARK R.,

              Plaintiff,

    v.

COMMISSIONER, SOCIAL
SECURITY ADMINISTRATION,

            Defendant.

CIVIL ACTION FILE NO.

1:18-CV-3077-JFK

## FINAL OPINION AND ORDER

Plaintiff in the above-styled case brings this action pursuant to § 205(g) of the

Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of the final decision

of the Commissioner of the Social Security Administration which denied his disability

application. For the reasons set forth below, the court **ORDERS** that the

Commissioner's decision be **AFFIRMED**.

## I.     Procedural History

Plaintiff filed an application for a period of disability and disability insurance

benefits on March 2, 2015, alleging that he became disabled on June 29, 2013.

[Record ("R.") at 16, 119, 251-57]. After Plaintiff's application was denied initially

and upon reconsideration, a hearing was held by an Administrative Law Judge ("ALJ")

on August 24, 2017. [R. at 16, 56-109, 119-51]. The ALJ issued a decision denying Plaintiff's claim on December 21, 2017, and the Appeals Council denied Plaintiff's request for review on May 9, 2018. [R. at 1-7, 16-37]. Plaintiff filed a complaint in this court on June 26, 2018, seeking judicial review of the Commissioner's final decision. [Doc. 1]. The parties have consented to proceed before the undersigned Magistrate Judge.

## II.  Facts

The ALJ found that Plaintiff has mild degenerative disc disease of the lumbar spine with Schmorl's node at inferior end plate of L2, depressive/affective disorder, and obsessive compulsive/anxiety disorder. [R. at 18]. Although these impairments are "severe" within the meaning of the Social Security regulations, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. [R. at 20-23]. The ALJ found that Plaintiff is unable to perform any of his past relevant work. [R. at 35]. However, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. [R. at 36]. As a result, the ALJ concluded that Plaintiff has not been under

2

a disability from June 29, 2013, the alleged onset date, through the date of the ALJ's decision. [R. at 37].

The decision of the ALJ [R. at 16-37] states the relevant facts of this case as modified herein as follows:

The claimant has a history of impairments dating to the 1980's and 1990's. He reports having diabetes since 1989, a history of epilepsy since 1995, a history of chronic hepatitis C since 1995, and hypertension for 20 years. The claimant worked 20 to 25 years with these impairments, performing medium and heavy exertional level work. (Exhibit 6E). He alleges that he became disabled from working on June 29, 2013, due to type 1 (insulin-dependent) diabetes mellitus, epilepsy, chronic depression, chronic low back pain due to osteoarthritis, chronic hepatitis C, and hypertensive cardiovascular disease. (Exhibit 2E, p. 2). The claimant is 63 years old and was advanced age at his alleged onset date. He has not worked since the alleged onset date, and has not applied for Social Security Administration ("SSA") early retirement benefits. The claimant acknowledges that he stopped working on the alleged onset date because he was laid off. (Exhibit 2E, p. 2).

In October 2012, months before the claimant was laid off on his alleged onset date, he was seen by his longtime treating doctor, Thomas DiFulco, M.D., for follow

AO 72A
(Rev.8/82)

up of diabetes and hypertension. The claimant's blood sugars were "doing well" and his last hemoglobin A1C was 5.6. Hypertension was stable. He also had experienced "no seizures in many years" and took phenobarbital. (Exhibit 4F, p. 7). Musculoskeletal exam was normal, memory was normal, poor judgment and insight were noted, and there was edema noted in his extremities. Medications were continued, including hydrocodone for low back pain, with Dr. DiFulco noting that the claimant "uses this for [low back pain] caused by lifting heavy objects at work." (Exhibit 4F, pp. 8-9; Exhibit 11F, p. 67; Exhibit 12F, p. 20).

In October 2013, the claimant reported that he was depressed since he lost his job and that his sugars were fluctuating because he was not being regular with mealtimes. He was "not having problems with chest pain, shortness of breath, dizziness, or swelling." (Exhibit 4F, p. 13; duplicate at Exhibit 8F, p. 50). On exam, the claimant appeared depressed but had appropriate mood and affect, and normal insight and judgment were noted. Musculoskeletal exam was normal, and he had no edema. He was started on Paxil for depression. (Exhibit 4F, pp. 15-16; duplicate at Exhibit 8F, pp. 52-53; Exhibit 12F, p. 16).

In November 2013, the claimant reported having a lot more motivation since he started taking Paxil, and he stated that he "thinks a lot of the problem is situational due

4

to not having a job." He weighed 180 pounds with a body mass index ("BMI") of 26.58, and his blood pressure was 118/78. (Exhibit 4F, p. 18; duplicate at Exhibit 8F, p. 32; Exhibit 12F, p. 13). A cursory exam was unremarkable. (Exhibit 4F, p. 19).

Handwritten progress notes from Dr. DiFulco from April 2014 through January 2016 describe cursory exams at best, including blood pressure readings. (Exhibit 12F, pp. 1-8, 11-12). Otherwise, the doctor's treatment notes reveal that Plaintiff's vital signs were taken and lab tests were ordered during office visits or that Plaintiff did not see Dr. DiFulco at all but simply called the office for medication management. (Exhibit 4F, 7F, 8F, 9F, 10F, 11F).

PACT Atlanta treatment records document a diagnosis of obsessive-compulsive disorder ("OCD"), as well as bipolar disorder NOS, personality disorder traits, and a history of alcohol dependence in remission. (Exhibit 1F, 5F, 15F). Depression was noted to be situational related to the work layoff and his father's passing. (Exhibit 1F, pp. 1, 25). The claimant began treatment after being arrested for shoplifting coins in June 2014. (Exhibit 1F, pp. 3, 25). Treatment records from PACT Atlanta note that he had begun collecting coins after he lost his job and that he may have had a manic episode prior to this theft. (Exhibit 1F, pp. 9, 27). He had increased anxiety related to this event with 12 hours spent in jail. (Exhibit 1F, p. 25).

5

Based on psychiatric evaluations by Todd Antin, M.D., in July 2014, the claimant was diagnosed with alcohol dependence in remission, bipolar NOS, and OCD. Paxil was increased for OCD tendencies. (Exhibit 1F, pp. 18, 21, 27). His case was diverted into the local mental health court. (Exhibit 1F, pp. 1, 3). Treatment records in February 2015 show that the claimant reported that he could no longer work due to both medical and psychiatric reasons and that he remained very depressed overall, with little response to Paxil. (Exhibit 1F, p. 2; duplicate at Exhibit 5F, p. 12). However, Dr. Antin noted in September 2014 that medications were "working effectively but he has neglected his therapy to a certain extent." (Exhibit 1F, p. 16). Therapy notes indicate that his treatment was effective. (Exhibit 1F, pp. 6, 8, 11, 13, 19, 23). Mental status exams consistently described normal concentration and attention, normal/intact memory, and normal/good judgment. (Exhibit 1F, pp. 1, 9, 15, 17; Exhibit 3F, p. 4).

On February 9, 2015, the claimant presented to Dr. DiFulco for a "family consultation." The treatment record reflects no exam, but labs were ordered, and diabetes mellitus, juvenile, was assessed as controlled. (Exhibit 4F, pp. 36-38). Contemporaneous handwritten progress notes indicate a cursory exam, noting that the claimant was "chronically ill appearing," still with no blood pressure reading. The

6

notes also indicate that the claimant, his mother, and his sister were discussing disability and asking Dr. DiFulco for a letter stating that the claimant was disabled. (Exhibit 7F, p. 5; duplicates at Exhibit 4F, p. 44; Exhibit 12F, p. 8).

In March 2015, a month after the claimant told Dr. Antin that he remained very depressed overall, he told his therapist that "he has been feeling much less depressed, much better since seeing Dr. Antin recently, believes meds are helping plus the increased socialization he has been experiencing as part of his legal requirements for diversion program, mens group he has been attending." (Exhibit 5F, p. 9). Therapy notes indicate that the claimant's current treatment was effective. (Exhibit 5F, pp. 1, 3, 6, 7, 10). Dr. Antin opined that the claimant was "currently functioning at an improved level" and "showing good improvement in mood symptoms." (Exhibit 5F, pp. 2, 4).

At a consultative exam in May 2015, the physical and mental status exams were unremarkable. The claimant reported that all the medications that he had taken for years worked. X-rays showed mild degenerative changes of the lumbar spine with no acute osseous pathology, i.e., disc space narrowing and small vertebral body osteophyte formation at L2-3, minimal disc space narrowing at L4-5, and mild facet arthropathy at L4-5 and L5-S1. (Exhibit 3F; duplicate x-ray at Exhibit 18F, p. 5).

7

Based on the history given and exam findings, Jessie Al-Amin, M.D., diagnosed type 1 diabetes mellitus on insulin, history of epilepsy with no recent seizures on medication, chronic depression currently asymptomatic except for insomnia with medication, chronic low back pain secondary to osteoarthritis, mild degenerative changes of the lumbar spine noted on x-ray, and chronic hepatitis C.

Dr. Al-Amin opined that the claimant can reach overhead and handle objects without difficulty and has no difficulty climbing stairs. Apparently based on the claimant's report that he can lift 30 pounds, sit for two hours, and stand for one hour, Dr. Al-Amin opined that the claimant may have difficulty carrying more than 30 pounds and may have difficulty with prolonged sitting and prolonged standing. On exam, the claimant had normal motor strength of 5/5 throughout, normal gait and posture, and only a slightly reduced range of motion in the neck, back, hips, and knees. The claimant had no difficulty rising from a sitting to standing position, could bend over while sitting, but had difficulty squatting. Dr. Al-Amin opined that stooping or bending may be problematic. He also noted that the claimant's fine and gross motor coordination appeared intact and that the claimant had good hand-eye coordination. (Exhibit 3F).

8

On June 1, 2015, the claimant presented after falling in the bathroom and hurting his ribs. X-rays were ordered. The claimant weighed 201 pounds with a BMI of 29.68. Blood pressure is not indicated, but unspecified hypertension, as well as controlled diabetes and depression, were assessed. (Exhibit 4F, pp. 83-86). Contemporaneous handwritten progress notes show that the claimant's blood pressure was 88/60 and that he was ill-appearing and very tender at the right chest wall. Lasix was discontinued and other blood pressure medications were put on hold. (Exhibit 12F, p. 6). X-rays on June 1, 2015, showed suspected mildly/minimally displaced fracture of the seventh right-sided rib. (Exhibit 4F, p. 67; duplicates at Exhibit 7F, p. 4; Exhibit 18F, p. 11).

On July 13, 2015, Dr. DiFulco noted that the claimant had fallen one time in the last year and was "not at risk for falls." (Exhibit 4F, pp. 93-97; multiple duplicates at Exhibit 10F). The contemporaneous handwritten progress note shows the claimant had "started walking again" and that he had lost eight pounds since his last visit. (Exhibit 12F, p. 4).

From July 21, 2015, through September 25, 2015, there are only patient communications with Dr. DiFulco. (Exhibit 7F, pp. 35-46; duplicates at Exhibit 10F). As seen on October 12, 2015, the claimant weighed 203 pounds, with a BMI of 29.98.

9

(Exhibit 10F, p. 14). A cursory exam was unremarkable. Dr. DiFulco noted that the claimant's mood seemed positive. (Exhibit 12F, p. 2). On October 15, 2015, Dr. DiFulco stated that the claimant's diabetes was "well controlled." The physician advised the claimant to continue working on his diet and to exercise regularly if possible. (Exhibit 10F, p. 10). Patient communications and incoming calls for medications follow through December 2015. (Exhibit 11F, pp. 95-107).

On January 11, 2016, the claimant was seen by Dr. DiFulco and weighed 211 pounds with a BMI of 31.16. According to the handwritten progress note, the claimant was feeling good. "He says sometimes he's manic, then he gets lethargic. He says diet is not good." A cursory exam was unremarkable. (Exhibit 11F, p. 87; Exhibit 12F, pp. 1, 11).

On January 13, 2016, Dr. DiFulco informed the claimant that he currently had a hemoglobin A1C of 7.4 and that no change in medication was needed. The physician advised the claimant to "focus more on the need to cut back on calories and foods that are not good for a diabetic diet." Dr. DiFulco also wrote, "This is the highest A1C you have had to my knowledge." (Exhibit 11F, pp. 79, 83).

In February 2016, the claimant presented to Dr. Antin for medication refills. The claimant reported that medications were working well. He also reported visiting

his mother frequently. He stated that he "knows for a fact that he will never work again" and that he felt that being unemployed had made him gain weight. Treatment notes show that the claimant was "doing better with his diet because he cannot stand being overweight anymore." Mental status exam showed normal concentration and attention, impaired short-term memory, good judgment, no change in energy, normal psychomotor activity, and euthymic mood. Dr. Antin noted that the claimant "has made great strides in his overall treatment" and was tolerating medications well other than some motor side effects. (Exhibit 15F, pp. 3-4).

Dr. DiFulco ordered studies on April 27, 2016, to help identify and support the claimant's history of seizures and low back pain. (Exhibit 18F, pp. 12-27). MRI of the lumbar spine again showed Schmorl's node involving the inferior end plate of L2, with adjacent edema which might be the source of his lower back pain, but "there is no posterior disc bulging or stenosis at this level." There was also a minimal disc bulge at L1-2, but no stenosis. (Exhibit 18F, pp. 28-29). Dr. DiFulco advised the claimant that the Schmorl's node at L2 "is a protrusion of cartilage into the vertebral bod[y] end plate [and] into the vertebra. This is likely the cause of your chronic back pain." (Exhibit 19F, p. 2). An EEG was normal. (Exhibit 18F, p. 30).

AO 72A
(Rev.8/82)

In a medical source statement dated April 6, 2016, Dr. Antin opined that the claimant has good ability to make performance adjustments for simple job instructions and function independently, but only fair ability to use judgment, follow rules, interact with a supervisor, maintain attention and concentration, and make adjustments for detailed but not complex job instructions. Dr. Antin opined that the claimant has poor ability to make adjustments for complex job instructions, relate to coworkers, deal with the public, and deal with work stress. Dr. Antin explained generally that the claimant has poor ability to work with others. Dr. Antin found that the earliest date of the proposed limitations was June 21, 2014. (Exhibit 14F, pp. 3-4; duplicate at Exhibit 16F). The psychiatrist opined that the claimant has only fair ability to make personal social adjustments. Dr. Antin indicated that the claimant has many symptoms of a depressive syndrome but no symptoms of a manic syndrome or bipolar syndrome. (Exhibit 14F, pp. 4-6). Dr. Antin assessed marked difficulties in maintaining social functioning and moderate deficiencies of concentration, persistence, or pace. Dr. Antin opined that the claimant's condition prevents him from engaging in gainful employment generally due to depression, fatigue, poor concentration, and poor socialization. (Exhibit 14F, pp. 7-8).

AO 72A
(Rev.8/82)

In May 2016, the claimant reported to Dr. Antin "that his mood has been stable lately" and that "he feels a lot better." The claimant stated that he often visited his mother with his sister, that he had a good support system, and that his sleep had improved. He also stated that he felt that his short term memory was getting worse and that his concentration had decreased. He reported that the mental health court diversion program had "changed his life, it made him more social." Dr. Antin noted that the claimant had done so well that he was being released from the program the next month. (Exhibit 20F, pp. 8-9; duplicate at Exhibit 23F, pp. 7-8).

As next seen by Dr. Antin on September 8, 2016, the claimant stated "that his mood has been stable lately. He feels better when he is able to interact with people and socialize. His mother passed away 2 months ago, after which his brother moved back here. He stated that he feels better, . . . he might be a little depressed from time to time but nothing major, not like before." Although the court diversion program had ended in June 2016, the claimant "continues to attend the meetings because he feels that they help him feel less isolated. He states that the program made him more social, and he states that he is happier. He was placed in the program as a result of shoplifting and subsequent arrest." Dr. Antin assessed that the claimant was "stable overall" and "has

13

made good recovery from his shoplifting episode and has been completely sober." (Exhibit 20F, pp. 2-3; duplicate at Exhibit 23F, pp. 4-5).

In October 2016, Dr. Antin completed a questionnaire for disorders related to anxiety or post-traumatic stress disorder ("PTSD"). Dr. Antin reported that the claimant had generalized anxiety with recurrent obsessions or compulsions causing marked distress. Dr. Antin opined that the claimant had marked difficulties in maintaining social functioning and moderate deficiencies of concentration, persistence, or pace. The claimant was found to be markedly restricted in activities of daily living and completely unable to function independently outside his home. (Exhibit 21F).

In November 2016, Dr. DiFulco reported that the claimant's lower back pain would constantly interfere with attention and concentration and would prevent him from working eight hours a day, even at less than a sedentary exertional level, since he could only lift five pounds occasionally and could not sit and stand/walk more than four hours total in an eight-hour day. Dr. DiFulco also reported that the claimant took medications (hydrocodone and phenobarbital) which would interfere with his ability to work. Dr. DiFulco suggested that the earliest date of the disabling limitations was three to four years ago, that is, around the time that the claimant was laid off from his job. (Exhibit 22F).

14

In May 2017, the claimant reported to Dr. Antin that he had "seen a progression in himself since he first came here regarding his sleep and mood." The claimant's mood was "very good" and "he feels like the more he talks to people and interacts with others, his anxiety disappears." He was attending meetings voluntarily "and feels engaged." (Exhibit 24F, pp. 1-2).

Additional facts will be set forth as necessary during discussion of Plaintiff's arguments.

## III. Standard of Review

An individual is considered to be disabled if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. See 42 U.S.C. §§ 423(d)(2) and (3).

AO 72A

(Rev.8/82)

"We review the Commissioner's decision to determine if it is supported by substantial evidence and based upon proper legal standards." <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1439 (11th Cir. 1997). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." <u>Id.</u> at 1440. "Even if the evidence preponderates against the [Commissioner's] factual findings, we must affirm if the decision reached is supported by substantial evidence." <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990). "'We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner].'" <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004) (quoting <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983)).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits." <u>Doughty v. Apfel</u>, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)). Under the regulations as promulgated by the Commissioner, a five step sequential procedure is followed in order to determine whether a claimant has met the burden of proving his disability. <u>See</u> <u>Doughty</u>, 245 F.3d at 1278; 20 C.F.R. §§ 404.1520, 416.920. At step one, the claimant must prove that he has not engaged in substantial gainful activity. <u>See id.</u> The claimant must establish at step two that he is suffering from a severe

AO 72A
(Rev.8/82)

impairment or combination of impairments.  <u>See id.</u>  At step three, the Commissioner will determine if the claimant has shown that his impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  <u>See</u> <u>Doughty</u>, 245 F.3d at 1278; 20 C.F.R. §§ 404.1520, 416.920.  If the claimant is able to make this showing, he will be considered disabled without consideration of age, education, and work experience.  <u>See id.</u>  "If the claimant cannot prove the existence of a listed impairment, he must prove at step four that his impairment prevents him from performing his past relevant work."  <u>Doughty</u>, 245 F.3d at 1278.  "At the fifth step, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides his past relevant work."  <u>Id.</u>  If, at any step in the sequence, a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends.  <u>See</u> 20 C.F.R. §§ 404.1520(a), 416.920(a).

## IV.    Findings of the ALJ

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.

2. The claimant has not engaged in substantial gainful activity since June 29, 2013, the alleged onset date. (20 C.F.R. § 404.1571, *et seq.*).

3. The claimant has the following severe impairments: mild degenerative disc disease of the lumbar spine with Schmorl's node at inferior end plate of L2, depressive/affective disorder, and obsessive compulsive/anxiety disorder. (20 C.F.R. § 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

5. The claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. § 404.1567(c) except he can frequently balance, stoop, kneel, crouch, and crawl. He is limited to: simple, routine tasks; simple, work-related decisions; and no more than occasional non-persistent interaction with the general public.

6. The claimant is unable to perform any past relevant work. (20 C.F.R. § 404.1565).

7. The claimant was born on September 16, 1954, and was 58 years old, which is defined as an individual of advanced age, on the alleged disability onset date. The claimant subsequently changed age category to closely approaching retirement age. (20 C.F.R. § 404.1563).

8. The claimant has at least a high school education and is able to communicate in English. (20 C.F.R. § 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. (See Social Security Ruling ("SSR") 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

AO 72A

(Rev.8/82)

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. (20 C.F.R. §§ 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 29, 2013, the alleged onset date, through the date of the ALJ's decision. (20 C.F.R. § 404.1520(g)).

[R. at 18-37].

## V.   Discussion

Plaintiff argues that the ALJ's decision denying his disability application should be reversed. [Doc. 11]. Plaintiff contends that the ALJ erred when he evaluated the various opinions offered by treating and consultative medical sources. [Id. at 3-31]. According to Plaintiff, the limitations opined by the medical sources are inconsistent with the ALJ's assessment of Plaintiff's residual functional capacity ("RFC") and the ALJ did not have good cause to discount the medical source opinions. [Id.]. Plaintiff also argues that the ALJ failed to properly evaluate his subjective complaints and did not consider his work history. [Id. at 31-33]. For a number of reasons, the court finds that the decision of the ALJ was supported by substantial evidence and was based upon proper legal standards.

AO 72A

(Rev.8/82)

## A. ALJ's Evaluation of Medical Opinions

Plaintiff argues that the ALJ committed reversible error because he did not properly evaluate medical source opinions when assessing Plaintiff's RFC. [Doc. 11 at 3-31]. Plaintiff contends that, although the opinions from various medical sources establish that he is disabled, the ALJ erroneously discounted these opinions when formulating the RFC. The ALJ found that Plaintiff's RFC allows him to perform medium work except that he can frequently balance, stoop, kneel, crouch, and crawl. [R. at 23]. The ALJ also found that Plaintiff can have no more than occasional non-persistent interaction with the general public and that he is limited to simple, routine tasks, and simple, work-related decisions. [Id.]. According to Plaintiff, the ALJ's RFC assessment conflicts with medical source opinions and the ALJ failed to offer good reasons for rejecting these opinions. [Doc. 11 at 3-31]. In support of his argument, Plaintiff cites to the opinions of treating psychiatrist Dr. Todd Antin, treating physician Dr. Thomas DiFulco, and consultative examiner Dr. Jessie Al-Amin. [Id.].

The ALJ noted that Dr. Antin, who began treating Plaintiff in July 2014, completed a "Medical Assessment of Ability to do Work-Related Activities (Mental)" on April 6, 2016. [R. at 20, 32, 1104-12]. Dr. Antin opined, *inter alia*, that Plaintiff has a good ability to function independently and make performance adjustments for

simple job instructions, but only a fair ability to use judgment, follow rules, interact with a supervisor, maintain attention and concentration, and make performance adjustments for detailed but not complex job instructions. [Id.]. Dr. Antin found that Plaintiff has a poor ability to make performance adjustments for complex job instructions, work with others, relate to coworkers, deal with the public, and deal with work stress. [Id.]. The psychiatrist also stated that Plaintiff has many symptoms of a depressive syndrome, but no symptoms of a manic syndrome or bipolar syndrome. [Id.]. Dr. Antin found that Plaintiff has marked difficulties in maintaining social functioning and moderate deficiencies of concentration, persistence, or pace. Finally, Dr. Antin opined that Plaintiff's condition prevents him from engaging in gainful employment generally due to depression, fatigue, poor concentration, and poor socialization. [Id.].

In another assessment dated October 17, 2016, Dr. Antin completed a questionnaire for disorders related to anxiety/PTSD. [R. at 21, 34, 1183-84]. The psychiatrist reported, *inter alia*, that Plaintiff has generalized anxiety with recurrent obsessions or compulsions which are a source of marked distress. [Id.]. Dr. Antin also opined that Plaintiff has marked restrictions in activities of daily living, marked difficulties in maintaining social functioning, moderate deficiencies of concentration,

21

AO 72A
(Rev.8/82)

persistence, or pace, and a complete inability to function independently outside his home. [Id.].

In a third assessment completed by Dr. Antin in August 2017, the psychiatrist found that Plaintiff has moderate limitations in interacting with others, and poor or no ability to relate to co-workers, deal with the public, and deal with work stress, but a good ability to function independently. [R. at 34, 1231-37]. Dr. Antin opined that Plaintiff has marked limitations in: understanding, remembering, or applying information; concentrating, persisting, or maintaining pace; and adapting or managing oneself. [Id.]. Dr. Antin also indicated that Plaintiff has poor socialization abilities and suffers from depression, isolation, low energy, and fatigue. [Id.].

Treating physician Dr. Thomas DiFulco offered opinions about Plaintiff's work-related limitations in 2015 and 2016. [R. at 24, 28, 427-28]. In a letter addressed "To Whom It May Concern" dated February 26, 2015, Dr. DiFulco stated that Plaintiff suffers from, *inter alia*, type 1 diabetes, epilepsy, chronic depression, and chronic low back pain due to osteoarthritis. [Id.]. The physician opined that Plaintiff "is no longer able to work, and should be considered totally disabled" and that "[h]e is no longer able to function at a job involving manual labor." [Id.].

Dr. DiFulco offered another opinion in November 2016.  [R. at 30, 1185-94]. Dr. DiFulco opined that Plaintiff's lower back pain would constantly interfere with his attention and concentration and would prevent him from performing competitive, full-time work on a sustained basis.  [Id.].  The physician reported that Plaintiff was only able to lift five pounds occasionally, sit for an hour at a time, and sit and stand/walk for a total of four hours in an eight-hour day.  [Id.].  Dr. DiFulco also indicated that Plaintiff took medications (hydrocodone and phenobarbital) which would interfere with his ability to work due to drowsiness and slow reaction time.  [Id.].  Dr. DiFulco opined that Plaintiff's complaints are credible and that his condition had been disabling for three to four years.  [Id.].

Dr. Jessie Al-Amin performed a consultative examination of Plaintiff in May 2015.  [R. at 29, 430-40].  Dr. Al-Amin diagnosed type 1 diabetes mellitus, history of epilepsy with no recent seizures, chronic depression, chronic low back pain, and chronic hepatitis C.  [Id.].  X-rays showed mild degenerative changes of the lumbar spine with no acute osseous pathology.  [Id.].  Dr. Al-Amin opined that the claimant can reach overhead and handle objects, has no difficulty climbing stairs, may have difficulty carrying more than 30 pounds, may have difficulty stooping or bending, and may have difficulty with prolonged sitting and prolonged standing.  [Id.].

23

The ALJ gave little weight to the opinions of treating sources Dr. Antin and Dr. DiFulco. [R. at 29-35]. The ALJ gave great weight to Dr. Al-Amin's opinions to the extent they are supported by the exam findings, but limited weight to the consultative physician's opinions to the extent they reflected Plaintiff's self-reported limitations. [R. at 29]. Plaintiff argues that the ALJ committed reversible error in evaluating the opinions. [Doc. 11 at 3-31]. According to Plaintiff, the ALJ should have given the opinions substantial weight and that the ALJ did not have good cause to reject the limitations found by the medical sources. [Id.]. The court disagrees.

Because the determination about whether a claimant has met the statutory definition of disability is reserved to the Commissioner, a medical source's opinion that a claimant is disabled is not controlling. See 20 C.F.R. §§ 404.1527(d), 416.927(d). However, the relevant regulations promulgated by the Social Security Administration state in pertinent part:

> (2)  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations. . . .

24

(i)  Generally, the longer a treating source has treated you . . . the more weight we will give to the source's medical opinion. . . .

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  A treating source's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.  Id.

The Eleventh Circuit has consistently held that opinions of treating physicians must be accorded substantial or considerable weight by the Commissioner unless good cause exists to discredit these opinions.  See Lewis, 125 F.3d at 1440; Lamb v. Bowen, 847 F.2d 698, 703 (11th Cir. 1988); Walker v. Bowen, 826 F.2d 996, 1000 (11th Cir. 1987); MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986); Broughton v. Heckler, 776 F.2d 960, 961 (11th Cir. 1985).  "Good cause exists 'when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.'"  Winschel v. Comm'r of Social Security, 631 F.3d 1176, 1179 (11th Cir. 2011) (quoting Phillips, 357 F.3d at 1241).  An ALJ may disregard a treating physician's opinion with good cause, but his reasons for doing so must be clearly articulated in the decision.  Id.

AO 72A
(Rev.8/82)

In the present case, the court finds that the ALJ had good cause and offered clearly articulated reasons for giving little weight to the opinions of treating sources Dr. Antin and Dr. DiFulco. See Forrester v. Comm'r of Social Security, 455 Fed. Appx. 899, 902 (11th Cir. 2012). With regard to Dr. Antin, the Commissioner correctly notes that many of treating psychiatrist's opinions were not medical opinions at all. [Doc. 16 at 7]. Instead, they were opinions reserved to the Commissioner. See 20 C.F.R. §§ 404.1527(d), 416.927(d). For example, in April 2016 and again in August 2017, Dr. Antin opined that Plaintiff's condition was disabling and prevented him from engaging in gainful employment. [R. at 1109, 1237]. These opinions were not entitled to any special deference.

With regard to Dr. Antin's medical opinions of Plaintiff's condition, as previously noted, the psychiatrist found the presence of a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause Plaintiff to decompensate. [R. at 1109]. Dr. Antin also found that Plaintiff had marked difficulties in maintaining social functioning and poor or no ability to relate to co-workers or deal with the public. [R. at 1109, 1184, 1232]. In addition, Dr. Antin

26

opined that Plaintiff's anxiety resulted in a complete inability to function independently outside the area of his home. [R. at 1183-84].

In explaining his reasons for giving little weight to Dr. Antin's opinions, the ALJ stated that the psychiatrist's opinions were not consistent with Plaintiff's mental health treatment records. [R. at 20-21, 32-35]. The ALJ pointed out that Dr. Antin's own treatment notes indicated that Plaintiff's "main source of his depression [was] losing his job two years ago and losing all his work companions." [R. at 20, 399]. Moreover, as the ALJ explained, Dr. Antin noted good improvement in mood symptoms and found that Plaintiff was stable and doing well. [R. at 20, 32-34, 1115-19]. Mental status exams from Dr. Antin consistently described the Plaintiff's mood as euthymic, with normal psychomotor activity and no problems with sleep. [Id.]. The ALJ also cited to Dr. Antin's treatment notes showing that the court diversion program that Plaintiff attended changed his life and made him more social. [R. at 20-21, 32-34, 1201-02]. As the ALJ wrote, Dr. Antin "noted in his contemporaneous treatment records that the claimant was attending a mental health court diversion program three times a week, which he enjoyed, 'especially the social interactions.'" [R. at 20, 32-34, 1115, 1118]. In May 2016, Plaintiff reported to Dr. Antin that "he is happier" and that "he has not felt better." [Id.].

27

The ALJ explained that Dr. Antin's records from September 2016 showed that, although Plaintiff's mother had passed away two months prior, Plaintiff reported that "he feels better when he is able to interact with people and socialize." [R. at 21, 32-34, 1172-73]. Plaintiff also stated that "he might be a little depressed from time to time but nothing major, not like before." [Id.]. Although the court diversion program ended in June 2016, Dr. Antin reported that Plaintiff "continues to attend the meetings because he feels that they help him feel less isolated. He states that the program made him more social, and he states that he is happier." [Id.]. The ALJ also referenced treatment records from Dr. Antin in May 2017 which again indicated that Plaintiff's anxiety disappears when he interacts with others. [R. at 21, 32-34, 1206]. In addition, the ALJ cited to Plaintiff's self-report that he visited his mother frequently, drove, went to the store, went out alone, did not need anyone to accompany him, and had no problems getting along with others. [R. at 21, 32-34, 362-69]. The ALJ explained that the record evidence does not support Dr. Antin's opinion that Plaintiff has, *inter alia*, marked difficulties in maintaining social functioning and is completely incapable of functioning independently outside his home. [R. at 20-21, 32-34].

The ALJ also cited to the numerous inconsistencies in Dr. Antin's opinions. [R. at 34]. For example, the ALJ noted that Dr. Antin opined in April 2016 that Plaintiff's

28

ability to function independently was "good." [R. at 34, 1105]. However, Dr. Antin opined six months later in October 2016 that Plaintiff was completely unable to function independently outside his home. [R. at 34, 1184]. Less than a year later, Dr. Antin changed his opinion again and stated in an August 2017 assessment that Plaintiff's ability to function independently was "good." [R. at 34, 1232].

The ALJ stated that he gave little weight to the opinion of Dr. Antin. [R. at 35]. The ALJ pointed out that, although Dr. Antin repeatedly referred to depression, low energy, and fatigue during assessments, the psychiatrist's treatment records revealed that Plaintiff consistently denied feeling depressed. [R. at 34]. The ALJ concluded by stating, "None of the disabling assessments offered by Dr. Antin is supported by, or consistent with, the treatment record or the record as a whole. His treatment records showed continued improvement with medication, counseling, and attending the court diversion program." [R. at 34]. Plaintiff has failed to show that the ALJ improperly evaluated Dr. Antin's opinions.

The ALJ also offered a number of reasons supported by the record for giving little weight to the opinions of treating physician Dr. DiFulco. [R. at 24-30, 35]. The physician opined in February 2015 that Plaintiff "is no longer able to work, and should be considered totally disabled" and that "[h]e is no longer able to function at a job

29

involving manual labor." [R. at 24, 28, 427-28]. Dr. DiFulco opined in November 2016 that Plaintiff could not perform competitive, full-time work on a sustained basis. [R. at 30, 1185-94]. As noted with regard to some of Dr. Antin's opinions, Dr. DiFulco's opinion that Plaintiff has met the statutory definition of disability is an issue that is reserved to the Commissioner and is not entitled to any special deference. See 20 C.F.R. §§ 404.1527(d), 416.927(d).

The ALJ pointed out that in Dr. DiFulco's February 2015 letter, the physician reported that Plaintiff "was laid off because of the recession" and that, since being laid off, Plaintiff had continued to apply for jobs involving manual labor. [R. at 24, 427]. The ALJ also noted that Dr. DiFulco's statement of disability in late February 2015 was made in accordance with and mirrored correspondence from Plaintiff's sister to the physician earlier in February 2015. [R. at 24-26, 28, 427-28, 993-94]. These facts were discussed at length by the ALJ and do not support Dr. DiFulco's opinion that Plaintiff "is no longer able to function at a job involving manual labor." [R. at 24, 428]. The ALJ further explained that even if Plaintiff were not able to work in a job involving manual labor, "it would not follow that he is totally disabled." [R. at 24]. In addition, the ALJ cited to records from Dr. DiFulco showing that in July 2014, more

AO 72A
(Rev.8/82)

than a year after the alleged onset date, Plaintiff reported that he liked physical labor and his job and that the work helped to keep his glucose low. [R. at 24, 423].

The ALJ offered other reasons for giving Dr. DiFulco's opinions little weight. [R. at 25, 29, 35]. The ALJ noted that the physician's treatment records from April 2014 through January 2016 described cursory exams and office visits which documented little more than the fact that Plaintiff's vital signs were taken and lab tests were ordered. [R. at 25]. Frequently, Plaintiff was seen by Dr. DiFulco and no exam was performed at all. [Id]. Dr. DiFulco's treatment notes often described incoming calls from Plaintiff for medication management rather than an actual office visit. When Plaintiff was examined by Dr. DiFulco, the physician's findings were generally unremarkable. [R. at 25-27, 456-57, 460, 462, 465, 469, 470, 477-79, 995-96]. For example, the ALJ noted that Dr. DiFulco's treatment records from June 2015 showed that Plaintiff "looks much better," "doing a lot better now," and "feels better generally." [R. at 27, 989]. In July 2015, Dr. DiFulco noted that Plaintiff started walking again. In October 2015 and January 2016, cursory exams were unremarkable, Plaintiff's mood seemed positive, and his diabetes was found to be well controlled and without complications. [R. at 28, 791, 963-64, 985, 986, 988]. Records indicated that in between these office visits there were only patient communications. [Id.]. The ALJ

noted that Plaintiff "had a high glucose reading in January 2016, normal in April 2016, still with hemoglobin A1C consistent with diabetes, but the treatment record describes no complaints, symptoms, or limitations resulting from diabetes." [R. at 29, 1215-16, 1223].

On April 27, 2016, Dr. DiFulco ordered an MRI of Plaintiff's lumbar spine which "showed Schmorl's node involving the inferior end plate of L2, with adjacent edema which might be the source of his lower back pain." [R. at 30, 1160-61]. However, Dr. DiFulco noted that there was "no posterior disc bulging or stenosis at this level." [Id.]. The physician also found that, although there was a minimal disc bulge at L1-2, there was no stenosis. [Id.]. Dr. DiFulco informed Plaintiff that the likely cause of his chronic back pain was the Schmorl's node at L2, which "is a protrusion of cartilage" into the vertebral body end plate and into the vertebra. [R. at 30, 1170]. The ALJ discussed this evidence in detail and stated that he gave great weight to Dr. DiFulco's opinion regarding the cause of Plaintiff's low back pain. The ALJ also explained that the physician's opinion supported a finding that Plaintiff's back impairment is severe. [R. at 18, 30].

Dr. DiFulco issued another assessment in November 2016 in which the physician opined, *inter alia*, that Plaintiff's pain would constantly interfere with

AO 72A
(Rev.8/82)

attention and concentration and would not allow him to work even at a sedentary level. [R. at 30, 1185-94]. Dr. DiFulco found that Plaintiff could lift only five pounds occasionally, could sit for a total of only two hours in a workday, and could stand/walk for a total of only two hours in a workday. [R. at 30, 1186-87]. Dr. DiFulco also opined that Plaintiff took medications that would interfere with his ability to work and that Plaintiff had been suffering from disabling limitations for three to four years. [R. at 30, 1189].

The ALJ found that "Dr. DiFulco's opinions have no support in his own treatment notes or the claimant's treating history." [R. at 30]. The ALJ explained that, although Plaintiff "worked for years at a medium exertional level with the same conditions and taking the same medications," Dr. DiFulco only found that Plaintiff's limitations "were disabling after he lost his job." [Id.]. The ALJ pointed out that there had been no other treatment ordered since the Schmorl's node was identified and that "there is no clinical evidence of record to describe or suggest any worsening of [Plaintiff's] back condition since hydrocodone was first prescribed." [R. at 30]. The ALJ also noted that the treatment record "does not describe ongoing complaints of back pain, but only when he was performing heavy work, and complained of back pain associated with his job." [Id.]. In addition, the ALJ cited to the opinions of State

agency consultants Dr. Abraham Oyewo and Dr. James Upchurch who reviewed the record in 2015. [R. at 30, 126-28, 143-45]. The medical consultants estimated that Plaintiff could perform a limited range of medium work and the ALJ stated that he gave great weight to their opinions. [R. at 30, 35]. In light of these facts, the court finds that the ALJ applied the proper legal standards by providing specific reasons supported by the record for giving little weight to the opinions of Dr. DiFulco.

Not only did the ALJ have good cause to give little weight to the opinions of treating physicians Dr. Antin and Dr. DiFulco, the undersigned concludes that the ALJ properly evaluated the opinion of consultative examining physician Dr. Al-Amin. [R. at 29, 430-40]. As noted *supra*, Dr. Al-Amin examined Plaintiff in May 2015 and opined that he can reach overhead and handle objects without difficulty, has no difficulty climbing stairs, may have difficulty carrying more than 30 pounds, may have difficulty stooping or bending, and may have difficulty with prolonged sitting and prolonged standing. [Id.]. The ALJ gave limited weight to Dr. Al-Amin's opinions to the extent they reflected Plaintiff's self-reported limitations regarding lifting, sitting, standing, stooping, and bending. [R. at 29]. Although Plaintiff argues that the ALJ erred in evaluating Dr. Al-Amin's opinion, substantial evidence supports the ALJ

34

decision to give the physician's opinion limited weight. [Doc. 11 at 7, 9, 12-13, 20-22].

The opinions of treating physicians must be accorded substantial weight unless good cause exists to discredit them, but no such deference must be given to the opinions of non-treating consultants such as Dr. Al-Amin. See Lewis, 125 F.3d at 1440; Swindle v. Sullivan, 914 F.2d 222, 226 n.3 (11th Cir. 1990); McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987). Moreover, the ALJ "is not obligated to agree with a medical opinion if the evidence tends toward a contrary conclusion." Swank v. Colvin, 2015 WL 649019, at *3 (S.D. Ga. February 13, 2015) (citing Sryock v. Heckler, 764 F.2d 834, 835 (11th Cir. 1985)). "As the fact-finder, the ALJ was entitled to weigh the evidence and ultimately reject portions of [the physician's] report as inconsistent with other evidence of record." Kinard v. Astrue, 2013 WL 541428, at *5 (N.D. Ala. February 7, 2013) (citing 20 C.F.R. § 416.929(c)(4); McCloud v. Barnhart, 166 F. Appx. 410, 418-19 (11th Cir. 2006) (holding that an ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion")).

The ALJ explained that he gave limited weight to some of Dr. Al-Amin's opinions because they were not supported by the exam findings. The ALJ noted that, although Dr. Al-Amin opined that Plaintiff may have difficulty carrying more than 30 pounds, Plaintiff had normal motor strength of 5/5 throughout. [R. at 29, 432-34]. The

35

ALJ also pointed out that Dr. Al-Amin's finding regarding Plaintiff's ability to carry was apparently based on a statement made by Plaintiff that he can only lift 30 pounds. [Id.]. The ALJ further noted that Dr. Al-Amin found that Plaintiff may have difficulty with prolonged sitting and prolonged standing but that these findings appear to be based on Plaintiff's report that he was limited to sitting for two hours and standing for one hour. [Id.]. The examination by Dr. Al-Amin revealed that Plaintiff had normal gait and posture, no difficulty rising from a sitting to standing position, and no difficulty getting on the exam table. [R. at 29, 430-40]. Although Dr. Al-Amin opined that Plaintiff may have problems stooping or bending, the exam showed that he could bend over while sitting and that he had only a slightly reduced range of motion in the neck, back, hips, and knees. [Id.]. Furthermore, as the ALJ explained, Dr. Al-Amin's examination of Plaintiff was generally unremarkable. [Id.]. X-rays of the lumbar spine showed only mild degenerative changes with no acute osseous pathology. [Id.]. There was disc space narrowing and small vertebral body osteophyte formation at L2-3, minimal disc space narrowing at L4-5, and mild facet arthropathy at L4-5 and L5-S1. [Id.]. The ALJ presented an extensive discussion of Dr. Al-Amin's examination and substantial evidence supports the ALJ's decision to give limited weight to certain portions of the consultative examiner's opinion.

36

Plaintiff argues that if the ALJ had a reasonable basis to question the treating and examining physicians, then he should have recontacted them or obtained additional evidence. [Doc. 11 at 23-24]. Plaintiff's argument is unpersuasive. The relevant regulations provide that the ALJ has discretion on whether to recontact a medical source. See 20 C.F.R. §§ 404.1520b, 416.920b ("We may recontact your medical source."). With regard to whether additional evidence should have been obtained, the Eleventh Circuit has held that "the ALJ has a basic obligation to develop a full and fair record." Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981). "Nevertheless, there must be a showing of prejudice before we will find that the claimant's right to due process has been violated to such a degree that the case must be remanded to the Secretary for further development of the record." Brown v. Shalala, 44 F.3d 931, 935 (11th Cir. 1995) (citing Kelley v. Heckler, 761 F.2d 1538, 1540 (11th Cir. 1985)). In making this determination, courts "are guided by whether the record reveals evidentiary gaps which result in unfairness or clear prejudice." Id. (citations and internal quotation marks omitted). An ALJ is not required to order a consultative examination or other evidence "as long as the record contains sufficient evidence for the administrative law judge to make an informed decision." Ingram v. Comm'r of Social Security Admin., 496 F.3d 1253, 1269 (11th Cir. 2007). Because the ALJ in the

37

present case offered a thorough discussion of the voluminous medical record and he had sufficient information to make an informed decision, he was not obligated to obtain additional evidence.

Plaintiff has cited to evidence in the record which supports his disability claim, such as treatment notes from Dr. DiFulco, Dr. Antin, and Therapist Paul Olander. [Doc. 11 at 24-31]. However, the fact that there are records which provide support for Plaintiff's claim is not determinative. The relevant issues that must be addressed by the court are whether the ALJ applied the proper legal standard and whether substantial evidence supports his decision. As previously noted, the Eleventh Circuit has stressed that a reviewing court is precluded from re-weighing the evidence or substituting its judgment for that of the Commissioner "even if the evidence preponderates against" the ALJ's decision. Moore v. Barnhart, 405 F.3d 1208, 1213 (11th Cir. 2005) (citation and internal quotation marks omitted) ("To the extent that Moore points to other evidence which would undermine the ALJ's RFC determination, her contentions misinterpret the narrowly circumscribed nature of our appellate review. . . ."). In the present case, "the ALJ properly explained the weight given to different medical opinions" and the ALJ's explanations were supported by substantial evidence in the record. Forrester, 455 Fed. Appx. at 902.

AO 72A

(Rev.8/82)

In sum, the ALJ thoroughly discussed the record and articulated numerous specific reasons supported by substantial evidence for giving little weight to the opinions of treating sources Dr. Antin and Dr. DiFulco, including the fact that their own treatment records contradict their opinions. Given these facts, the undersigned finds that the ALJ had good cause not to credit the treating sources' opinions. See Leiter v. Comm'r of Social Security Admin., 377 Fed. Appx. 944, 949 (11th Cir. 2010) ("Because the ALJ articulated specific reasons for declining to give the treating physician's opinion controlling weight, and these findings were supported by substantial evidence in the record, we hold that the ALJ had good cause to reject this opinion."); Moore, 405 F.3d at 1212 (same). The ALJ also explained the amount of weight given to the opinion of consultative examiner Dr. Al-Amin, and substantial evidence supports his decision on this issue. Accordingly, remand is not warranted based on the ALJ's evaluation of the opinion evidence.

**B.      Plaintiff's Subjective Symptoms**

Plaintiff's final argument is that the ALJ failed to properly evaluate his subjective complaints of symptoms and did not consider his work history. [Doc. 11 at 31-33]. According to Plaintiff, he has an excellent work history with covered earnings in all 124 possible work quarters for 30 years between 1983 and 2013, at

which point he was allegedly unable to work. [Id.]. Plaintiff contends that the ALJ erred because he failed to consider Plaintiff's exemplary work history when evaluating his subjective testimony. [Id.].

When a claimant seeks to establish disability through subjective testimony of symptoms, a "pain standard" established by the Eleventh Circuit applies. Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991). The claimant can satisfy this standard by showing: "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing Holt, 921 F.2d at 1223). "The 'pain standard' is applicable to other subjective symptoms as well." Crow v. Comm'r, Social Security Admin., 571 Fed. Appx. 802, 807 (11th Cir. 2014) (citing Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005)). "If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so." Wilson, 284 F.3d at 1225 (citing Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987)). The relevant Social Security regulations provide that factors which will be considered by the ALJ in evaluating a claimant's subjective symptoms include: (1) daily activities; (2) location, duration, frequency, and intensity

40

of the claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication the claimant takes to alleviate his symptoms; (5) treatment received, other than medication, for the relief of symptoms; (6) measures used for the relief of symptoms; and (7) any other factors concerning the functional limitations and restrictions due to the claimant's symptoms. See 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p. "A clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court." Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (citing MacGregor, 786 F.2d at 1054).

In the present case, the ALJ explained that he found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." [R. at 24]. Although Plaintiff contends that the ALJ failed to consider Plaintiff's stellar work history in evaluating his credibility, substantial evidence supports the ALJ's decision not to fully credit Plaintiff's subjective allegations. The court notes initially that the ALJ was not obligated to offer an extensive discussion of Plaintiff's work

41

history.  As the Eleventh Circuit has explained, "[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision . . . ."  Dyer, 395 F.3d at 1211; accord Brito v. Comm'r, Social Security Admin., 687 Fed. Appx. 801, 804 (11ᵗʰ Cir. 2017) ("[T]he ALJ was not required to examine or reference every piece of evidence, so long as it is evident, as it is here, that the ALJ considered Brito's medical condition as a whole.").

Moreover, although Plaintiff contends that his work history was not considered, the ALJ specifically noted in his decision that Plaintiff "worked over 20 to 25 years with [various] impairments, performing medium and heavy exertional-level work." [R. at 19].  The ALJ also pointed to Plaintiff's work history as evidence casting doubt on Plaintiff's subjective allegations.  The ALJ noted, for example, that Dr. DiFulco reported in February 2015 that Plaintiff "was laid off because of the recession" and that, since being laid off, Plaintiff had continued to apply for jobs involving manual labor.  [R. at 24, 427].  In addition, the ALJ cited to treatment notes from Dr. DiFulco showing that in July 2014, more than a year after the alleged onset date, Plaintiff reported that he liked physical labor and his job and that the work helped to keep his glucose low.  [R. at 24, 423].

AO 72A

(Rev.8/82)

The undersigned finds that the ALJ did not ignore Plaintiff's work history. The ALJ properly applied the pain standard in evaluating Plaintiff's credibility and substantial evidence supports the ALJ's finding that Plaintiff's subjective allegations are not entirely consistent with the evidence in the record. Remand is not appropriate based on this issue. [R. at 24].

## VI.    Conclusion

Based on the foregoing reasons and cited authority, the court concludes that the ALJ's decision was supported by substantial evidence and was based upon proper legal standards. It is, therefore, **ORDERED** that the Commissioner's decision be **AFFIRMED**. The Clerk is **DIRECTED** to enter judgment in favor of the Commissioner.[1]

**SO ORDERED**, this 10th day of September, 2019.

_____
JANET F. KING
UNITED STATES MAGISTRATE JUDGE

_____

[1]On December 26, 2018, an administrative order was issued staying this case in light of lapse of appropriations. [Doc. 15]. The stay was lifted as of January 25, 2019.

AO 72A

(Rev.8/82)